**Juan C. Chavez**, OSB #136428
**Hannah Bland**, OSB #252404
Email: jchavez@ojrc.info, hbland@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-328-3982

      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PENDLETON DIVISION

| | |
|---|---|
| JACOB STROCK, TARJEN JOKON, JAMES LIBOKMETO, JAMES DENTEL, MICHAEL WESLEY, and DYLAN PETERSON,<br><br>    Plaintiffs,<br><br>    v.<br><br>OREGON DEPARTMENT OF CORRECTIONS, JAMIE MILLER, MIKE REAL, DAVID JANTZ, BRANDON KROPP, BLAKE SURERUS, STACY BROTHERTON, MICHAEL FRANKS, and TYLER TARVIN,<br><br>    Defendants. | Case No. 2:22-cv-01904-AN<br><br><br>**PLAINTIFFS' TRIAL MEMORANDUM** |

## I.    <u>INTRODUCTION</u>

On December 9, 2020, a fight broke out in housing unit 3C of the Snake River Correctional Institution. Plaintiffs Strock, Jokon, Libokmeto, Dentel, Wesley, and Peterson were all in the housing unit at the time of the fight, but none participated in the fight. Nonetheless, all six plaintiffs were exposed to chemical agents and were not afforded the decontamination required under Oregon Administrative Rule and Eighth Amendment Standards. Each Plaintiff requested

decontamination from Defendants but their requests fell on deaf ears. The evidence described below and will be presented at trial will show the following. Two of the plaintiffs were chained to a wall for hours in the Disciplinary Housing Unit (DSU) and unable to mitigate the effects of the chemical agents on their own. One of the plaintiffs is a T4 paraplegic and unable to shower without assistance, let alone decontaminate in his cell. One of the plaintiffs was naked in the shower—far away from the fight—when he was sprayed directly and not allowed to rinse off, even though he was already standing in the shower and could easily decontaminate if only Defendants had allowed it. One of the plaintiffs was forced to lay in the chemical agents. Each Plaintiff was prohibited from properly decontaminating for days. Each Plaintiff tried to seek redress through the grievance process but each was denied. Left with no other options, Plaintiffs seek redress for the harm they suffered by presenting their claims to a jury.

## II.    STATEMENT OF FACTS

On December 9, 2020 around 9:00PM, a large disturbance erupted between members of the Sureños gang and white AICs. The fight took place in the dayroom of housing unit 3C at the Snake River Correctional Institution. In response to the fight, Defendant Kropp closed the "crash gate," the entry point into the housing unit, and along with other officers, began deploying chemical agents through the bars of the gate. Defendant Jantz put the institution on lockdown. After the fight, ODOC staff took some of the AICs to DSU and the rest of the AICs were celled-in within 3C, where the fight had occurred and the chemical agents deployed.

### a.  Jokon and Libokmeto

Plaintiffs Jokon and Libokmeto were standing at the sinks, located near to the crash gate, preparing food when the fight broke out. The fight erupted along racial lines; between the "whites" and the "Sureños." Plaintiffs Jokon and Libokmeto are both of Pacific Islander descent

and neither were involved in the fight. They both tried to stay out of the way of the disturbance but were both directly sprayed by chemical agents as officers sprayed through the crash gate.

At the time of the events at issue, facility cameras that capture the dayroom only provided a livestream video feed and did not record any video, according to Defendants Miller and Real. Therefore, the AICs that were taken to DSU were selected on a subjective basis, rather than having the benefit of video footage to determine who was fighting. Plaintiffs Jokon and Libokmeto were the only AICs of Asian/Pacific Islander decent taken to DSU and they will testify to their belief that they were selected to be taken to DSU because they are "brown" and were assumed to be one of the Sureños who were fighting.

While in DSU, they were both chained to a hand railing for four to five hours. During that time, they both asked multiple ODOC staff including Defendant Brotherson for a shower, a wet washcloth, and other means of decontamination, but were denied. They knew of other AICs who received a shower and decontamination, yet Plaintiffs Jokon and Libokmeto's requests were continually denied. A "Chemical Agent Deployment Form" was created for Plaintiffs Jokon and Libokmeto and it was included in the Unusual Incident Report (UIR) of the 3C fight. At trial, Plaintiffs will dispute the information on the form. It was only on December 12, 2020, days later, that they received a shower. Also included in the UIR were the misconduct reports for each of the individuals involved in the fight. Plaintiffs Jokon and Libokmeto did not receive misconduct reports for this event.

### b. Wesley and Peterson

Plaintiffs Wesley and Peterson were both in their cells when the fight broke out. They will testify that within their cells there are two vents: one that brings air into the cell and one that brings air out of the cell. When the large amount of spray was released into the dayroom, the

spray flowed into their cells, causing secondary exposure to the chemical agents. Although there is a vent that pulls air out of the cell, it creates a negative draft that causes air to flow in from underneath the cell door. After the fight, there was a large amount of chemical agents left on the floor, which did not get cleaned up until at least the next day.

Plaintiff Wesley, who is wheelchair-bound, and was housed in the cell closest to the crash gate, requires accommodations when showering and was not able to use his sink to wash away any of the chemical agent. On December 10, 2020, the morning after the fight, Defendant Tarvin called for medline despite the fact that the chemical agents were still covering the floor of the dayroom. Plaintiff Wesley was forced to wheel himself through the spray on the floor and could not avoid getting the chemical agents on his hands, triggering another reaction with the spray.

Plaintiff Peterson begged multiple ODOC staff, including Defendants Tarvin, Kropp, and Surerus to please turn off the ventilation system so those AICs who were celled-in would stop being re-exposed to chemical agents, but Defendants did not do so. Plaintiff Peterson also repeatedly asked for a shower and each request was met with the response, "the sergeant said 'no.'"

Despite there being a policy dictating what to do when an AIC has had secondary exposure to chemical agents, in practice, Defendants seem to think that access to water is enough. Defendant Real specifically testified, "[w]e don't have an official decontamination process for [secondary exposure]."

### c. Dentel and Strock

Plaintiff Dentel was taking a shower in the handicap shower stall that is right next to the crash gate when the fight broke out. As officers reached their arms through the crash gate to deploy the chemical agents, Plaintiff Dentel received copious amount of spray directly on his

body. The chemical agents were so strong that he vomited multiple times while standing in the shower stall. When officers entered the unit, Plaintiff Dentel was ordered to get out of the shower. He asked that he could be allowed to rinse off in the shower that he was already standing in because, as he told the officer "I can't breathe," but the officer said, "I don't care, get out."

Plaintiff Strock was in the dayroom when the fight broke out and as soon as he saw the fight starting, he separated himself from the disturbance and went back to his cell. He was not involved in the fight. After ODOC staff sprayed large amounts of chemical agents in the dayroom, they ordered everyone to lay face down in the spray that covered the floor. The spray got in Plaintiff Strock's eyes, mouth, and nose.

Later in the evening, after some of the AICs were taken to DSU and the rest were celled-in, Plaintiffs Dentel and Strock were individually escorted out of their cells and forced to walk through the spray that was on the floor. ODOC interviewed Plaintiffs Dentel and Strock seeking additional information about the groups involved in the fight. After the interview, Plaintiffs Dentel and Strock each had to walk back through the spray that was on the floor of the dayroom and track it back into their cells. They did not receive a shower for several days. When Plaintiff Strock asked Defendant Kropp for a shower, Defendant Kropp said the higher up were not giving anyone showers until the state police come in to complete their investigation.

## III.    ELEMENTS OF THE CLAIMS

### a.  42 U.S.C. § 1982 Deliberate Indifference Claims

Plaintiffs allege that Defendants Miller, Real, Jantz, Kropp, Surerus, Brotherson, and Tarvin were each deliberated indifferent to Plaintiffs' serious medical needs by failing to provide them with timely decontamination after exposure to chemical agents. Defendants' actions or inactions violated Plaintiffs' Eighth Amendment rights. Their claims under 42 U.S.C. 1983

require they prove: (1) violation of plaintiffs' federal civil rights by (2) a person acting under color of state law. Whether Defendants acted under color of state law should not be in dispute.

Under the Eighth Amendment, an incarcerated person has the right to be free from cruel and unusual punishments. A defendant violates an incarcerated individual's rights if they were "deliberately indifferent" to the prisoner's "serious medical need." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002). A "serious medical need" is present whenever the "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and includes the painful effects of "pepper spray." *Id.* (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992)). All six plaintiffs suffered painful and prolonged effects of exposure to chemical agents, and they will each be able to satisfy the "serious medical need" element of their claims against each defendant.

"Deliberate indifference" is evidenced when an official "knows of and disregards an excessive risk to [a prisoner's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference "may appear when prison officieals deny, delay, or intentionally interfere with medical treatment[.]" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). Defendant Brotherson knew that Plaintiffs Jokon and Libokmeto were suffering the effects of a direct application of chemical agents yet disregarded their requests for a wet washcloth, a shower, and other means of decontamination. Defendants Kropp, Tarvin, and Surerus were plainly aware of the copious amounts of spray left in unit 3C and Plaintiffs Strock, Peterson, Dentel, and Wesley's repeated request to shut off the ventilation system and to provide decontamination, and those defendants denied these requests. The supervisory defendants failed to train and supervise their staff to provide proper decontamination; this is evident given the supervisory defendants

testimony that they do not have a decontamination process for secondary exposure and decontamination only happens in special housing.

### b. Negligence Claim

In Oregon, a negligence claim requires the plaintiff to prove the following: (1) that defendant's conduct caused a foreseeable risk of harm; (2) that the risk is to an interest of a kind that the law protects against negligent invasion; (3) that defendant's conduct was unreasonable in light of the risk; (4) that the conduct was a cause of plaintiff's harm; and (5) that plaintiff was within the class of person and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent. *Son v. Ashland Community Healthcare Services*, 239 Or App 495, 506 (2010) (quoting *Solberg v. Johnson*, 306 Or 484, 490-91 (1988)). OAR 291-013-0104(5) provides as follows:

> (f) Those affected by a chemical agent shall be permitted to wash their face, eyes, and other exposed skin areas, as soon as possible after the chemical agent has been used.
> (g) Those exposed to a chemical agent in a closed area shall be permitted to move to an unaffected area as soon as possible after the chemical agent has been used.
> (h) An adult in custody receiving a direct application of a chemical against shall be under continuous staff observation for the first ten minutes.
> (i) Clothing exposed to a chemical agent shall be removed as soon as feasible and clean clothing made immediately available.
> (j) An adult in custody receiving a direct application of a chemical agent shall be examined by a health care professional as soon as feasible after the chemical agent has been used.
> > (A) The adult in custody shall then be observed approximately every ten minutes for the first 30 minutes after receiving the application of chemical agent.
> > (B) All observations shall be documented with a date and time reference.
> > (C) The documentation shall accompany the use of force review documentation.
> (k) An adult in custody receiving a direct application of a chemical agent shall be offered a shower as soon as time and circumstance allows.
> > (A) Staff shall document the date and time the shower was offered to the adult in custody, and any refusal to shower by the adult in custody.
> > (B) The documentation shall accompany the use of force review documentation.

Defendant Oregon Department of Corrections and its agents had a duty to ensure that each of the plaintiffs received adequate decontamination. Decontamination is outlined by administrative

rule to address the type of harm that these foreseeable plaintiffs experienced. Defendant Oregon Department of Corrections actions and failure to act was unreasonable.

As for Plaintiffs Jokon and Libokmeto, they were chained to a wall for hours without having any available means to decontaminate. Plaintiffs Wesley, Peterson, Strock, and Dentel, were all stuck in their cells unable to move to an unaffected area despite their pleas to have the ventilation system turned off and allowed to have a shower. Plaintiff Strock had to lay in the chemical agent without being allowed a shower and new set of clothes. Wesley was forced to wheel his wheelchair through the spray while the prison continued daily operations such as medline. Time and circumstance clearly allowed for these plaintiffs to receive proper decontamination but Defendant Oregon Department of Corrections was more concerned with wrapping up the investigation than tending to these prisoners' serious medical needs.

## IV.    DAMAGES

Plaintiffs seek damages for the injuries they each suffered because of Defendants actions or failures to take any action to provide decontamination. The jury will be asked to award Plaintiffs reasonable compensation for their pain and suffering. The length and extent to which Defendants' tortious actions caused Plaintiffs harm will likely be an issue at trial. Plaintiffs will each testify to the extent these events have affected them physically, mentally, and emotionally. Plaintiffs would be additionally entitled to attorneys fees and costs under 42 U.S.C. § 1988 if the jury find Defendants liable for a constitutional violation.

DATED:  June 1, 2026

/s/ *Hannah Bland*
Hannah Bland, OSB #252404
Of Attorneys for Plaintiffs